IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

LISA GEISSLER,

            Plaintiff,

     v.

ATLANTIC CITY POLICE OFFICER
DARRELL CATANIO, and MARINA
DISTRICT FINANCE COMPANY, LLC
d/b/a BORGATA HOTEL CASINO &
SPA

            Defendants.

---

HONORABLE JEROME B. SIMANDLE

Civil No. 16-792 (JBS/JS)

**OPINION**

APPEARANCES:

Jon R. Skolnick, Esq.
Jenntyng Chern, Esq.
LAW OFFICES OF JON RORY SKOLNICK
100 Morris Avenue, Suite 101
Springfield, NJ 07081
    Attorneys for Plaintiff

Tracy L. Riley, Esq.
LAW OFFICES OF RILEY & RILEY
100 High Street, Suite 302
Mount Holly, NJ 08060
    Attorney for Defendant Atlantic City Police Officer Darrell
    Catanio

Russell L. Lichtenstein, Esq.
Justin A. Britton, Esq.
COOPER LEVENSON, PA
1125 Atlantic Avenue, Third Floor
Atlantic City, NJ 08401
    Attorneys for Marina District Finance Company, LLC d/b/a
    Borgata Hotel Casino & Spa

**SIMANDLE**, Judge:

**I.   INTRODUCTION**

Plaintiff Lisa Geissler ("Plaintiff" or "Geissler") alleges in this tort action that while she was a registered guest of the Borgata Hotel and Casino & Spa in Atlantic City in October of 2014, she was falsely accused by Borgata employees of stealing alcohol and subsequently wrongfully arrested and charged with defiant trespass by a police officer with the Atlantic City Police Department ("ACPD"), Darrell Catanio. Plaintiff pleads claims against Officer Darrell Catanio ("Officer Catanio" or "Catanio") and the Marina District Finance Company, LLC d/b/a Borgata Hotel Casino and Spa ("Borgata"). She alleges a number of constitutional claims as well as common law tort claims against both Defendants Catanio and Borgata.

Presently before the Court are three motions: Borgata's Motion for Summary Judgment [Docket Item 43]; Catanio's Motion for Summary Judgment [Docket Item 44]; and Plaintiff's Cross-Motion for Summary Judgment [Docket Item 48]. For the reasons set forth below, the Court will grant in part and deny in part Borgata's motion; deny Officer Catanio's motion; and deny Plaintiff's cross-motion.

## II.  BACKGROUND

### A. Procedural Background

The Court previously dismissed former Defendants City of Atlantic City and Atlantic City Police Department from this

2

action [Docket Items 20 & 21], and directed Plaintiff to submit
a Revised Amended Complaint [Docket Item 33 at 20], which
Plaintiff did [Docket Item 36, "Revised First Amended Complaint"
or "RFAC"].

The RFAC pleads a violation of 42 U.S.C. § 1983 against
Catanio based on false arrest and malicious prosecution (First
Count) [id. ¶¶ 22-26]; violation of the New Jersey State
Constitution and the New Jersey Civil Rights Act against Catanio
(Second Count) [id. ¶¶ 27-28]; a common law claim of malicious
prosecution against Borgata (Third Count) [id. ¶¶ 29-33];
defamation against Borgata (Fourth Count) [id. ¶¶ 34-36];
negligence against Borgata (Fifth Count) [id. ¶¶ 37-38];
intentional infliction of emotional distress ("IIED") against
Borgata (Sixth Count) [id. ¶¶ 39-41]; and negligent infliction
of emotional distress ("NIED") against Borgata (Seventh Count)
[id. ¶¶ 42-44].

Borgata moves for summary judgment as to the malicious
prosecution claim [Docket Item 43-2 at 12-25]; the defamation
claim [id. at 25-28]; the negligence claim [id. at 28-32]; the
IIED claim [id. at 32-38]; and the NIED claim [id. at 32-38].
Plaintiff's Cross-Motion opposes summary judgment (and in fact
moves for summary judgment in her favor with regard to
liability) as to each claim asserted against Borgata, with the

3

exception of her defamation claim, which she concedes is barred by the statute of limitations. [Docket Item 48-5 at 2.] Borgata filed a Reply [Docket Item 51] that also serves as its Response in Opposition to Plaintiff's Cross-Motion.

Catanio moves for summary judgment as to both the first and second counts, which allege federal and state constitutional violations, respectively. [Docket Item 44-4 at 3.] Again, Plaintiff opposes this motion and requests that summary judgment be granted in her favor as to Catanio's liability. [Docket Item 48-5 at 2.] Catanio filed a Reply [Docket Item 50] that also serves as his Response in Opposition to Plaintiff's Cross-Motion.[1] The Court decides the motions without oral argument pursuant to Rule 78, Fed. R. Civ. P.

---

[1] Catanio argues that the Court should not consider Plaintiff's cross-motion because it is untimely, as it was filed after the Dispositive Motion deadline of August 15, 2017, and further notes that he was not able to depose Plaintiff with respect to the supporting Declaration [Docket Item 48-1] that she filed with her cross-motion. [Docket Item 50 at 3.] Borgata argues that the Court should disregard Plaintiff's Declaration because it was unsigned. [Docket Item 51 at 8-11.] Plaintiff's Counsel filed a letter [Docket Item 53] stating that "an unsigned copy of the Declaration was inadvertently filed. A signed copy has been filed." [Id. at 2.] Plaintiff's signed Declaration was in fact filed to the docket eight days after Borgata raised this argument [Docket Item 52]. The Court will, in its discretion, consider Plaintiff's Declaration as signed.
    Plaintiff also correctly notes that cross-motions related to the subject matter of the original motion may be filed together with opposition papers, pursuant to Local Civil Rule 7.1(h). Accordingly, the Cross-Motion is not untimely.

4

**B. Factual Background[2]**

The Court looks to Statements of Undisputed Material Fact and responses thereto, the exhibits, and other evidence as appropriate in order to describe the factual background of this case, and notes disputes as they arise. Where not otherwise noted, a fact is undisputed. For purposes of Borgata's and Catanio's motions, the Court takes all facts in the light most favorable to Plaintiff; for purposes of Plaintiff's Motion, the Court takes all facts in the light most favorable to the Defendant against whom each claim is asserted.

On October 17, 2014, Plaintiff Lisa Geissler was a guest of the Borgata Hotel Casino and Spa. Plaintiff and her friend, Barbara Sancilardi, planned to spend Sancilardi's birthday at the Borgata. Plaintiff and Sancilardi had dinner reservations for a restaurant in the Borgata sometime between 6:00 PM and

---

[2] For purposes of the instant motions and pursuant to Local Civil Rule 56.1, the Court looks to the RFAC [Docket Item 36] when appropriate; Borgata's Statement of Undisputed Material Facts [Docket Item 43-1], Plaintiff's Response thereto [Docket Item 48-7], and Borgata's Reply thereto [Docket Item 51-1]; Catanio's Statement of Undisputed Facts [Docket Item 44-12] and Plaintiff's Response thereto [Docket Item 48-6]; Plaintiff's Counter Statement of Material Facts [Docket Item 48-4], Catanio's Response thereto [Docket Item 50-1], and Borgata's Response thereto [Docket Item 51-2]; and related exhibits and documents (including Plaintiff's signed Declaration [Docket Item 52], which is identical in substance and form to the unsigned Declaration filed in connection with her cross-motion [Docket Item 48-1], with the addition of her signature).

7:00 PM. After dinner and between 8:00 PM and 9:00 PM, Plaintiff and Sancilardi attended a comedy show at the Music Box, another venue in the Borgata. After attending the show, the two women went to one or two other bars in the Borgata and then went to the Bobby Flay Steak restaurant, also in the Borgata.

The parties dispute what happened next. Borgata contends that restaurant staff refused to serve Plaintiff alcohol "due to her high level of intoxication" [Docket Item 43-1 ¶ 6], but Plaintiff denies that she was intoxicated [Docket Item 48-7 ¶ 6]. Plaintiff admits that "a big ruckus" ensued when she and Sancilardi sat down at Bobby Flay Steak. Borgata contends that restaurant staff contacted Borgata Security officials because the women "appeared to be intoxicated, were disorderly, and were disrupting the restaurant"; it alleges that they also verbally abused the restaurant manager, Keith Jones. [Docket Item 43-1 ¶ 8.] Plaintiff admits that she caused a commotion at the restaurant but denies that this was because she was intoxicated and states that it resulted from restaurant staff refusing to serve Plaintiff after Plaintiff fell from a stool. [Docket Item 48-7 ¶¶ 8-9.]

Borgata security staff (Jacqueline Previti and Beatriz Flanagan[3]) responded to the restaurant; while they spoke to

---

[3] Plaintiff's responses to interrogatories [Docket Item 43-4 at

Plaintiff and Sancilardi, they were notified over the radio that

the two women were suspected of having stolen alcohol from the

bar in the comedy club earlier that night. [Docket Item 43-1

¶ 11.] Plaintiff disputes this and denies that she stole

anything. [Docket Item 48-7 ¶ 11.][4] Security Supervisor Muhammad

---

12] states that it is her recollection that the security
personnel that approached her were a man and a woman.
[4] The incident report produced by Borgata reflects the following
sequence of events: at approximately 9:18 PM, Lurdes Ortiz was
acting as the bartender at a temporary satellite bar in the
comedy club, when she asked another bartender, Tien Truong, from
the main bar at the comedy club to watch her bar while Ortiz
took a personal break. When Ortiz returned, she realized that
"two small bottles of wine and a beer" were missing from her
bar. Ortiz notified her supervisor, Beverage Manager Stephanie
Brown, who notified "the Podium" of the theft at 10:09 PM. Brown
notified "Supervisor Alleyne," who filled out the incident
report; Brown also told Alleyne that Brown called Surveillance
"and they reported positive coverage which showed two females
removing the items." At that time, the "two females [were]
currently unidentified and had already entered the show at the
time they were notified. They have not exited as of the time of
this report[,]" which may have been when the report was created
at 10:26 PM. [Docket Item 43-4 at 37.]
       Brown's "Associate Voluntary Statement" states that after
Ortiz notified her that the items were missing, "I called
Surveillance and spoke w/ Paul. He later called back and said
that 2 females took the items. I then called the security podium
to report the theft." Id. at 58
       The incident report also describes a review by officer
"akennish" of security footage as follows: "FCC reviewed the
requested footage and observed at approximately 21:04 hours
[Ortiz] grab her handbag from the portable bar and walk toward
the main bar. [She] conversed with the male bartender before
exiting the Music Box. At approximately 21:08 hours customers
Lisa Geissler and Barbara Sancilardi were observed entering the
Music Box and walking toward the portable bar. As they passed
the bar it appeared customer Geissler stopped momentarily before
entering the seating area. At 21:13 hours [Ortiz] returned to
her station and immediately reported to Mgr Brown. At

Iddinn prepared a statement reflecting that when the women were informed that they were suspected of stealing alcohol, they "became irate and said they were leaving" whereupon Iddinn "informed Geissler that she could not depart until this matter was resolved." Id. at 53. Iddinn stated that Sancilardi cursed and said, "We are leaving" but Iddinn "explained that Geissler had taken some alcohol from the Music Box and needed to make restitution. Geissler declined stating 'I didn't take anything' and 'I'm going to sue Borgata.'" Id. Iddinn stated that "[b]oth females continued to act disorderly at which point Security Control was notified to call ACPD." Id. Geissler denies, again, that she stole any alcohol and states that she became irate because she was being wrongfully accused of theft. [Docket Item 48-7 ¶¶ 13-15.]

The ACPD's police report regarding this incident records a comment at 11:04:39 PM stating, "FCC RING ROUND .. MEET SEC REF TO A FML THAT STOLE A BOTTLE OF WINE .. AND REF[US]ING TO PAY FOR IT. .. SEC IS HOLDING THE FML[.]" [Docket Item 44-8 at 4.] Less than eight minutes later, at 11:12:33, the report records a

---

approximately 22:30 hours both customers were observed entering Bobby Flay and approaching the bar. It appeared both customers ordered a drink and consumed same. At 23:02 hours Specialists Flanagan and Previti were observed entering Bobby Flay and escorting the female customers to the Security office." Id. at 40.

comment stating "PER SEC DISRG THE FEMALES PAYED." Id. The Court
reads these comments to reflect that Borgata security called for
an ACPD officer to meet security staff in reference to a female
that stole a bottle of wine and refused to pay for it, and that
they were holding the female; and subsequently requested that
ACPD disregard the request for help as the females paid for the
wine.

Next, per Flanagan's affidavit, Previti and Flanagan
"escorted [Sancilardi and Geissler] to Borgata's Security Office
to await the arrival of the Atlantic City Police Department" as
a result of their "refusal" to pay for the stolen alcohol.
[Docket Item 43-4 at 66 ¶ 7.] Flanagan states that they
continued to be "irate and unruly including yelling and cursing
at" Flanagan, Previti, "and other Borgata Security Department
personnel." Id. ¶ 8. Plaintiff disputes this and states that she
did not "curse, yell, or swear at the Borgata security
officers[.]" [Docket Item 52 ¶ 28.]

Ultimately, at the Borgata security office, Sancilardi
either "gave" [Docket Item 43-4 at 54] or threw a $50 bill at
security officers in order to cover the cost of the allegedly
stolen alcohol (valued at $23), while both Geissler and
Sancilardi continued to deny that they had stolen it. [Docket
Items 43-1 ¶ 18; 52 ¶ 15.] Iddinn states that the $27 in change

due to Sancilardi was refused by her and placed in Lost & Found. [Docket Item 43-4 at 54.]

Borgata security personnel informed Geissler and Sancilardi that, per Flanagan's affidavit, "they were being evicted from the property" [Docket Item 43-4 at 67 ¶ 10]; however, per Iddinn's report, while "[b]oth Geissler and Sancilardi were advised that they were being formally evicted for being disorderly towards Security[,]" "[b]oth females were advised that they were permitted to stay in room 2488 because they were intoxicated[;] they were allowed to stay until check out time." [Docket Item 43-4 at 54.] Catanio admits this as well. [Docket Item 50-1 ¶ 14.] Although no party states this, the Court understands this (construing the facts, here, in the light most favorable to Plaintiff) to have meant that Iddinn allowed (or would have allowed) the women to stay in room 2488 until mid-morning the next day, October 18.

Borgata security officers then took Sancilardi and Geissler toward the 24th floor of the Water Club, where that room was located. While en route to that location, the group encountered Officer Catanio.

Officer Catanio's own narrative of the events in the police report states that he responded "to the Borgata for the report of a theft" at approximately 11:07 PM. Id. at 8. This time

10

appears to be between when ACPD was first called and when

Security instructed ACPD to "disregard" as "the females paid."

[Docket Item 44-8 at 4.] When he arrived, he met Iddinn, who

> stated that a female, later identified as Lisa
> Geissler, stole two unopened bottles of wine and a
> beer from the bar at the Music Box. Ms. Geissler and
> her friend Barbara Sancilardi were both still on
> scene. Mr. Iddin [sic] indicated that the theft was
> recorded by video surveillance. Mr. Iddin, however,
> also stated that he was not sure at this time whether
> Borgata still intended to pursue criminal charges. Mr.
> Iddin stated that both females were formally evicted
> and due to their disruptive behavior and disorderly
> conduct he requested that I accompany him as he
> escorted the women to their hotel room. Both females
> appeared to be intoxicated, slurring their speech and
> staggering when they walked. . . .
>
> I contacted police communications and requested that
> the back-up officer meet me at the Water Club
> elevators. Communications responded that the back-up
> officer was disregarded because communications
> received a telephone call from another security
> manager who had indicated that the Casino was no
> longer going to sign a complaint. At this time I
> confirmed with security that Borgata no longer
> intended to pursue criminal charges against Ms.
> Geissler because Ms. Sancilardi had reluctantly agreed
> to pay for the alcohol Ms. Geissler stole. Despite the
> fact that Borgata no longer intended to pursue theft
> charges, Mr. Iddin still requested that I accompany
> them while they escorted the women to their hotel room
> due to their disruptive behavior.

Id. at 8. Iddinn's report states: "After leaving the Security

Office both females continued being disorderly. ACPD Officer

Catanio arrived at the top of the Security Escalator and was

informed of the situation and advised by Specialist Previti that

11

Security Control had called ACPD Dispatch to recall him. Catanio stayed with the escort to room 2488." [Docket Item 43-4 at 54.]

The record before the Court does not reflect whether or not Iddinn informed Catanio that Plaintiff and Sancilardi, despite their "formal eviction," were being escorted to their room where they had Iddinn's permission to stay "until check out time."

From the time he joined the escort until well after Plaintiff was arrested, Catanio was informed multiple times that Sancilardi had paid $50.00 and that the Borgata was not pressing charges. [Docket Item 43-4 at 60, 62.] Flanagan's statement states that "Previti notified the ACPD officer [Catanio] that one of the females had made restitution of $50.00 to security and that they were being escorted to their room. ACPD officer followed Security to the tower. Once on the 24th floor Security Specialist Previti again advised the ACPD officer [Catanio] that the females had pa[id] Security for the items that were taken." [Docket Item 43-4 at 62.] Previti's statement also reflects that she told Catanio about the money Sancilardi had tendered to Borgata security staff. Id. at 59. She stated: "ACPD Officer Catanio responded to property after Security control recalled him. Catanio was informed from the beginning that he was no[] longer needed for the theft that occur[r]ed because Sancilardi paid the money that was the value for the 2 small bottles of

12

wine and beer ($23.00) that Geissler took from the Music [B]ox. Catanio followed us as we escorted the females to their room 2488. Multiple times en route to the room Ca[]tanio was told that we were no longer going to file charges for theft. It seemed like Catanio was not understanding what we were saying to him. At one point Catanio stated to this writer that even though Geissler paid[] for the drinks she still needed to be charged for the crime she committed." Id.

Borgata and Plaintiff agree that at some point while Plaintiff was being escorted to the room, she began to videotape the interaction on her cell phone. [Docket Items 48-4 ¶¶ 21-23; 51-2 ¶ 21.] Catanio disputes this. [Docket Item 50-1 ¶¶ 21-23.]

When Plaintiff, Sancilardi, Catanio, and Borgata personnel arrived at the room, the parties dispute what happened next. Some evidence in the record reflects that Sancilardi and Plaintiff refused to go into their room and that Sancilardi struck Officer Catanio in the chest while cursing at him. Catanio immediately arrested Sancilardi for assaulting an officer and resisting arrest. [Docket Item 43-1 ¶¶ 30-31.] Sancilardi and Plaintiff deny that Sancilardi struck Catanio. [Docket Item 52 ¶¶ 23-24.] Generally, the parties dispute the demeanor of Plaintiff and Sancilardi throughout their interaction with Borgata staff and Catanio.

13

The parties also dispute what happened after Catanio arrested Sancilardi. Borgata and Plaintiff appear to agree that Plaintiff continued to tape Catanio, Catanio repeatedly instructed her to stop taping, and Plaintiff refused. [Docket Items 43-1 ¶¶ 32-34; 48-7 ¶¶ 32-34.] Borgata and Plaintiff dispute whether Plaintiff refused to enter her hotel room. [Docket Item 48-7 ¶ 33.] Again, Borgata and Plaintiff agree that Catanio told Plaintiff that if she didn't put her phone away, he would arrest her. [Docket Item 43-1 ¶ 32.] Shortly thereafter, as admitted by Borgata and Plaintiff, Catanio arrested Plaintiff for "obstruction." [Docket Item 51-2 ¶ 26.]

Catanio recites this sequence of events slightly differently, stating that "Plaintiff refused to cooperate. Plaintiff refused to gather her belongings. . . . Plaintiff was charged with defiant trespass." [Docket Item 44-12 ¶¶ 20-21.] His police report states: "Ms. Geissler refused medical attention [that she had previously requested] and refused to sign the medical refusal form. She continued waving her cell phone, yelling and would not enter her room. At this time I informed Ms. Geissler that she was under arrest." [Docket Item 44-8 at 9.]

Borgata and Plaintiff agree that Catanio repeatedly sought to have a member of Borgata staff sign a complaint against

14

Plaintiff for theft, both before and after she was arrested;
however, due to Sancilardi having given Borgata staff $50, no
one from Borgata was willing to sign such a complaint. Security
Officer David Ruch wrote in his statement that at approximately
1:35 AM he was working Security Control and received a call from
a male ACPD operator "who stated, 'The officer that responded to
your property is waiting for you to send somebody down to sign a
complaint.' Security Specialist Flanagan was sitting next to
this writer who advised that there is no complaint, the officer
was told that the other female made restitution for the other
female. This writer informed the ACPD dispatcher of this who
said 'Ooook', and that he would relay this to the officer."
[Docket Item 43-4 at 60.] Indeed, no one from Borgata signed a
complaint against Plaintiff for theft, and Plaintiff was not
arrested for or charged with a theft offense. Sancilardi
testified at her deposition that, as she was being put in the
police car, she heard a female officer discussing whether
Plaintiff could be charged with theft: the female officer "said,
we can't do that, she said, because she paid for them, pointing
to [] me, and they said, well, we'll charge her with
trespassing." [Docket Item 51-2 ¶ 30.] [5]

---

[5] The Court notes, generally, that while certain photographs,
apparently representing still images taken from surveillance
footage of the parties on the night in question, appear in the

Plaintiff was, in fact, subsequently charged with "defiant trespass"; after Catanio arrested her, she was transported to the jail in downtown Atlantic City [Docket Item 43-5 at 110], where she was held from approximately 11 p.m. to around 2 or 3 a.m. [Docket Item 52 ¶ 29.] Plaintiff avers that the ACPD did not return her belongings after her release, and she waited outside the Police Department until 8 a.m., when Sancilardi was released. Id. ¶ 31.

The charge of defiant trespass was dismissed against Plaintiff for lack of prosecution. [Id. ¶ 34; Docket Item 43-5 at 23.] Sancilardi pled guilty to resisting arrest, and the charge of assaulting an officer was dismissed. [Docket Items 44-12 ¶ 24; 51-2 ¶ 36.] The record reflects Sancilardi's plea (to Case No. S 2014 5106) and the dismissal of her summons (Case No. S 2014 5105) "pursuant to a plea agreement" [Docket Item 43-5 at 25-47]. As to the dismissal of the charge against Plaintiff (which was Case No. S 2014 5108 [Docket Item 43-5 at 22]), the minutes from the Municipal Court state, after the conclusion of

---

evidentiary record [e.g., Docket Item 43-4 at 41-52], no party has submitted as an exhibit in support of any of the instant motions either a) video surveillance footage of any interactions between the parties on that night, or b) any other evidence that would tend to show that Plaintiff possessed the allegedly stolen bottles.

16

Sancilardi's plea allocution and statement that she was "free to go up to the window to take care of your payment":

> THE PROSECUTOR: And the co-defendant is going to be dismissed, then, as well.
>
> THE COURT: Yes.
>
> THE PROSECUTOR: All right.
>
> THE COURT: I dismissed that already.
>
> THE PROSECUTOR: Okay.
>
> THE COURT: Already dismissed. Okay.
>
> THE PROSECUTOR: Thank you, Your Honor.

[Docket Item 43-5 at 48.]

Plaintiff states in her declaration that she was extremely humiliated due to this incident and that it traumatized her and her family. [Docket Item 52 ¶¶ 27, 30, 32-33.]  Defendants note that Plaintiff was not physically injured, did not receive medical attention, and, while she saw a counselor, it was the same counselor she saw before the incident occurred; they generally contest the degree to which this incident affected Plaintiff. [Docket Items 43-1 ¶¶ 52-53; 51-2 ¶¶ 34-35.]

Finally, the Court again notes that no party has submitted evidence from the casino video surveillances depicting any aspect of this case.


**III. STANDARD OF REVIEW**

17

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In reviewing a motion for summary judgment, the court is required to examine the evidence in light most favorable to the non-moving party, and resolve all reasonable inferences in that party's favor. Hunt v. Cromartie, 526 U.S. 541, 552 (1999); Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). Credibility determinations are not appropriate for the court to make at the summary judgment stage. Davis v. Portlines Transportes Maritime Internacional, 16 F.3d 532, 536 n.3 (3d Cir. 1994).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The non-moving party "'need not match, item for item, each piece of evidence proffered by the movant,'" but must simply present more

18

than a "mere scintilla" of evidence on which a jury could reasonably find for the non-moving party. <u>Boyle v. Cnty. of Allegheny Pennsylvania</u>, 139 F.3d 386, 393 (3d Cir. 1998) (quoting <u>Anderson</u>, 477 U.S. at 252).


**IV.  DISCUSSION**

Plaintiff asserts Count One (violation of § 1983 for false imprisonment and malicious prosecution) against Officer Catanio, and Count Two (violation of the New Jersey state constitution) tracks this claim; both Plaintiff and Catanio move for summary judgment as to these claims, and they will be analyzed together.

Plaintiff asserts Count Three (common law malicious prosecution), Count Five (common law negligence), Count Six (IIED), and Count Seven (NIED) against Borgata. Both Plaintiff and Borgata move for summary judgment on each of these claims. These will be analyzed in turn.

Finally, Plaintiff concedes that her defamation claim (Count Four) against Borgata is barred by the statute of limitations. [Docket Item 48-5 at 2.] Accordingly, the Court will GRANT Borgata's motion for summary judgment as to Count Four.


**A. Constitutional claims against Catanio**

19

Plaintiff claims that Officer Catanio falsely imprisoned and maliciously prosecuted Plaintiff when he arrested and charged her with defiant trespass. [Docket Item 1 ¶¶ 16-22.] Both Plaintiff and Catanio argue that there is no genuine dispute of material fact as to Catanio's liability on these counts. The Court disagrees, and will deny Catanio's Motion as well as Plaintiff's Motion as to Counts One and Two.

### 1. False imprisonment

Catanio moves for summary judgment with regard to the constitutional claims based on false imprisonment or false arrest because, he claims, "[n]o reasonable fact finder could . . . conclude that Officer Catanio lacked probable cause to arrest Plaintiff[.]" [Docket Item 44-4 at 7.]

Catanio claims that Plaintiff cannot make out a prima facie case of false arrest against him because Officer Catanio was advised by Borgata staff, when he arrived at the Borgata, "of the theft and eviction." Id. Catanio argues that as soon as he arrived after "Borgata security called the police in reference to a theft[,]" "he had probable cause to arrest Plaintiff for theft." [Id. at 8.] Catanio continues: "[E]ven if [he] later learned that restitution had been made in reference to the theft--that Sancilardi paid for the wine and that Borgata did not wish to pursue criminal charges--[he] was advised that the

20

two had been formally evicted" and therefore had probable cause
to arrest Plaintiff for defiant trespass "when she refused to
leave a property from which she had been evicted." Id.

In opposition, Plaintiff argues that "Officer Catanio . . .
insisted on escorting Plaintiff and Ms. Sancilardi to their
hotel room and [therefore] had personal knowledge that Plaintiff
could not be trespassing because she was merely complying with
Borgata security's instructions." [Docket Item 48-5 at 4.]
Plaintiff argues, with regard to the alleged theft, that upon
Catanio's arrival at the scene, "Borgata immediately advised
Officer Catanio that his assistance was no longer needed because
Ms. Sancilardi already paid for the allegedly stolen wine and
beer." Id. at 17. She avers that "since Plaintiff and Ms.
Sancilardi were being escorted to their hotel room by Borgata
security officers and Officer Catanio, they could not be
trespassing" and denies that she and Sancilardi refused to enter
their hotel room; Catanio, she claims, therefore lacked probable
cause to arrest Plaintiff for defiant trespass. Id.

As both parties correctly state, "'[t]he proper inquiry in
a section 1983 claim based on false arrest . . . is not whether
the person arrested in fact committed the offense but whether
the arresting officers had probable cause to believe the person
arrested had committed the offense.'" Groman v. Twp. of

21

Manalapan, 47 F.3d 628, 634 (3d Cir. 1995)(quoting Dowling v. City of Phila., 855 F.2d 136, 141 (3d Cir. 1988)). "[W]here the police lack probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest." Groman, 47 F.3d at 636. Probable cause is defined as those "facts and circumstances sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." Gerstein v. Pugh, 420 U.S. 103, 111 (1975)(internal citations omitted). "Probable cause to arrest requires more than mere suspicion; however it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." Orsatti v. New Jersey State Police, 71 F.3d 480, 482-83 (3d Cir. 1995). "To determine whether an officer had probable cause to arrest an individual," one "examine[s] the events leading up to the arrest, and then decide[s] 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." Maryland v. Pringle, 540 U.S. 366, 371 (2003)(quoting Ornelas v. U.S., 517 U.S. 690, 696 (1996)). "Generally, the existence of probable cause is a factual issue." Groman, 47 F.3d at 635.[6]

---

[6] But see Jobes v. Evangelista, 369 N.J. Super. 384, 398 (App. Div. 2004)("While . . . the existence of probable cause is ordinarily a question of law, nevertheless, it becomes a mixed

The Court finds, for the following reasons, that there is a genuine dispute of material fact as to whether Catanio had probable cause to arrest Plaintiff. Accordingly, summary judgment is not warranted on these counts for either Catanio or Plaintiff.

Catanio contends that he had probable cause to arrest Geissler either for trespassing or for a theft offense. The Court will analyze each contention in turn.

### a. Trespassing

New Jersey has defined the commission of "defiant trespass" in N.J.S.A. § 2C:18-3b(1), which states that "[a] person commits a petty disorderly persons offense if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given by . . . actual communication to the actor . . . ." The statute also provides: "It is an affirmative defense to prosecution under this section that . . . [t]he structure was at the time open to members of the public and the actor complied with all lawful conditions imposed on access to or remaining in the structure; or . . . [t]he actor reasonably believed that the owner of the

---

question of law and fact when the underlying facts, as here, are in dispute.")(citing <u>Helmy v. City of Jersey City</u>, 178 N.J. 183 (2003); <u>Liptak v. Rite Aid, Inc.</u>, 289 N.J. Super. 199, 215 (App. Div. 1996)).

structure, or other person empowered to license access thereto, would have licensed him to enter or remain . . . ." N.J.S.A. § 2C:18-3d(2) to (3).

Catanio claims that he had probable cause to arrest Plaintiff for trespass pursuant to this statute because Iddinn notified him when he arrived that Plaintiff had been "formally evicted." This does not end the inquiry, however.

In the Court's view, a reasonable finder of fact could conclude based upon this evidentiary record that, at the time Catanio arrested Geissler, a reasonable officer would have known that Geissler and Sancilardi were being escorted back to their room and that they had permission to stay there until check-out time the following morning. Iddinn, the Security Supervisor, stated that he had given Plaintiff and Sancilardi permission to stay there until the next morning. Furthermore, Plaintiff contends that she was not refusing to leave the Borgata; Catanio disagrees. Taking the facts in the light most favorable to Plaintiff, a reasonable finder of fact could easily conclude that Plaintiff was, at the time of her arrest, "licensed" to be where she was at the Borgata, and that a reasonable officer in Catanio's position would have known this. Cf. State v. Gibson, 218 N.J. 277, 288 (2014)("[U]nder the 'remains' portion of the statute, a person who is privileged or licensed to enter onto

24

property may be prosecuted for defiant trespass <u>if he refuses to</u> <u>leave after he is told to do so.</u> There, the duration of the incursion--how long he 'remains' unwelcome on the property--is a factor.")(emphasis added).

There is also a genuine dispute of material fact as to whether Plaintiff was refusing to enter the room (which a reasonable finder of fact could--but need not--conclude would vitiate that license). A further dispute of fact exists as to whether a reasonable officer in Catanio's position would have known that Iddinn had effectively rescinded the "formal eviction" of Plaintiff and Sancilardi until "check out time."

Because of these disputes, summary judgment on this claim for either party is inappropriate on these grounds. It remains for the finder of fact to conclude whether Catanio had probable cause to arrest Plaintiff for trespassing.

### b. Theft

As to a theft offense, the Court looks to its earlier decision in this case, stating: "While the Borgata's decision whether or not to press charges does not have an effect on an officer's reason to believe a crime has been committed, a reasonable officer does not have probable cause to think a theft offense has been committed where (1) as alleged here, it is undisputed that the property in question has been paid for to

25

the satisfaction of the vendor, and (2), reading the Amended Complaint in the light most favorable to Plaintiff, the allegation of theft was made and then recanted to the arresting officer before the arrest was made." Geissler v. City of Atlantic City, No. 16-792, 2017 WL 1156730, at *6 (D.N.J. Mar. 28, 2017).

Plaintiff has put forth evidence that would allow a reasonable finder of fact to find that this was, in fact, the case, pointing to the affidavits of Borgata employees indicating that Catanio was informed that Borgata had canceled the call, that a police presence was unnecessary as the alcohol had been paid for, and that there was, in the words of Ruch, "no complaint." The Court finds, on this evidentiary record, that a reasonable finder of fact could conclude that complainant was unwilling to confirm to the responding police officer that a theft occurred, and that such a finder of fact could therefore reasonably conclude that Catanio lacked probable cause to arrest Plaintiff for a theft offense. See Romero v. Fay, 45 F.3d 1472 (10th Cir. 1995) (probable cause standard of Fourth Amendment does not require investigating defendant's alleged alibi witnesses but does require "officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at

26

all before invoking the power of warrantless arrest and detention").

On the other hand, a reasonable finder of fact could also conclude that a reasonable officer in Catanio's position would have had probable cause to arrest Geissler for a theft offense. The Court declines Plaintiff's invitation to decide that no reasonable officer could have lawfully arrested her for stealing the alcohol as a matter of law. There are disputes of material fact about whether Plaintiff in fact stole the alcohol and about whether sufficient information was available to an arresting officer to support a finding of probable cause.

Accordingly, because the Court discerns several genuine disputes of material fact about whether Catanio had probable cause to arrest Geissler for either trespassing or theft, both Catanio's and Plaintiff's motions for summary judgment as to her constitutional claims of false arrest and false imprisonment are respectively DENIED.

### 2. Malicious Prosecution

Catanio and Plaintiff also respectively move for summary judgment on Plaintiff's constitutional claims based on malicious prosecution by Catanio.

Catanio argues that he is entitled to summary judgment on these claims because (1) he had probable cause to arrest

27

Plaintiff for defiant trespass [Docket Item 44-4 at 9]; (2) he does not concede that the prosecution terminated in Plaintiff's favor, id.; and (3) Plaintiff has not put forth sufficient evidence to allow for a finding of malice, id. at 10. Plaintiff disagrees with all of these contentions. [Docket Item 48-5 at 18-19.]

In order to prove a claim under § 1983 for deprivation of the right to be free from malicious prosecution, a plaintiff must put forth evidence "that: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in [plaintiff's] favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." Johnson v. Knorr, 477 F.3d 75, 81-82 (3d Cir. 2007).

Catanio concedes that a reasonable finder of fact could find for Plaintiff on elements (1) and (5). The Court finds that a reasonable finder of fact could similarly (but need not) find for Plaintiff on the remaining elements, and will deny both parties' summary judgment motions as to this claim as well.

### a. Favorable termination

Catanio claims that Plaintiff cannot show that the prosecution against her "ended in her favor" because "the termination of Plaintiff's charges [for lack of prosecution] are not indicative of her innocence[,]" citing <u>Morris v. Verniero</u>, 453 F. App'x 243, 245 (3d Cir. 2011)("prior criminal case must have been disposed of in a way that indicates the innocence of the accused in order to satisfy the favorable termination element"). [Docket Item 44-4 at 9.] In <u>Morris</u>, a panel of the Third Circuit ruled that the Attorney General's dismissal of an indictment did not constitute a favorable termination where the "Attorney General clearly stated that he did not dismiss Morris' indictment because he thought Morris was innocent" and in fact stated, "'[L]et's be clear; the defendants in these cases may have prevailed in their motions to suppress, but they are criminals nonetheless. All were carrying some form of contraband for distribution in communities in this and other states.'" <u>Morris</u>, 453 F. App'x at 246. The Third Circuit also found a lack of a genuine dispute of material fact as to the element of favorable termination in that case because Morris only belatedly claimed that the contraband had been planted on him, and "no rational juror could have credited Morris' belated assertion that the drugs were planted[.]" <u>Id.</u>

29

The Third Circuit has stated clearly that "actual innocence is not required for a common law favorable termination[.]" Smith v. Holtz, 87 F.3d 108, 113 (3d Cir. 1996)(citing Restatement of the Law of Torts §§ 659, 660 (1938) and noting that "a dismissal of charges on double jeopardy grounds is a common law favorable termination"). See also Donohue v. Gavin, 280 F.3d 371, 384 (3d Cir. 2002)(finding that a nol pros decision by prosecutor did not constitute favorable termination where plaintiff had previously been convicted at trial, conviction was reversed, and prosecutor declined to re-try plaintiff "in the interest of judicial economy and to preserve scarce judicial resources" because plaintiff had "already served approximately 2 years, 7 months and 23 days, and if convicted, . . . would most likely not receive any additional jail time").

The Third Circuit has applied "the Restatement (Second) of Torts §§ 659, 660 to determine whether a Section 1983 malicious prosecution claim was deemed to have terminated in favor of the accused[.]" Williams v. N.J. Div. of State Police, No. 10-3478, 2012 WL 1900602, at *9 (D.N.J. May 24, 2012)(citing Kossler v. Crisanti, 564 F.3d 181, 186 (3d Cir. 2009)(en banc)). The Restatement's Section 659 (Manner of Termination) provides that "[c]riminal proceedings are terminated in favor of the accused by (a) a discharge by a magistrate at a preliminary hearing, or

30

(b) the refusal of the grand jury to indict, or (c) the formal abandonment of the proceedings by the public prosecutor, or (d) the quashing of an indictment or information, or (e) an acquittal, or (f) a final order in favor of the accused by a trial or appellate court." In the comment to Clause C, the Restatement continues: "The usual method by which a public prosecutor signifies the formal abandonment of criminal proceedings is by the entry of a nolle prosequi . . . . [U]nless new proceedings are instituted, the formal abandonment of the proceedings by the public prosecutor is a final termination in favor of the accused, except under the conditions stated in §§ 660 and 661.[7] The rule stated in this Section is applicable, however, to any method other than that of the entry of a nolle prosequi, by which a public prosecutor may formally abandon the prosecution of the proceedings as, for example, by a motion to dismiss the complaint."

Here, the dismissal of the case against Plaintiff would seem to fall into the category delineated by Clause C: that her case was dismissed after the public prosecutor formally abandoned it.

---

[7] Section 661 discusses the "Impossibility of Bringing the Accused to Trial" and is not relevant to the Court's analysis.

Section 660 of the Restatement, "Indecisive Termination of Proceedings," states: "A termination of criminal proceedings in favor of the accused other than by acquittal is not a sufficient termination to meet the requirements of a cause of action for malicious prosecution if (a) the charge is withdrawn or the prosecution abandoned pursuant to an agreement of compromise with the accused; or (b) the charge is withdrawn or the prosecution abandoned because of misconduct on the part of the accused or in his behalf for the purpose of preventing proper trial; or (c) the charge is withdrawn or the proceeding abandoned out of mercy requested or accepted by the accused; or (d) new proceedings for the same offense have been properly instituted and have not been terminated in favor of the accused." The comments to this section note that, as to Clause (a), "[a]lthough the accused by his acceptance of a compromise does not admit his guilt, the fact of compromise indicates that the question of his guilt or innocence is left open. Having bought peace the accused may not thereafter assert that the proceedings have terminated in his favor." In contrast, however, the comment to Clause (b) states that "[t]he abandonment of the proceedings because the accuser believes that the accused is innocent or that a conviction has, in the natural course of events, become impossible or improbable, is a sufficient

termination in favor of the accused. In that case <u>it is immaterial that the proceedings were abandoned at the request of the accused rather than upon the uncontrolled initiative of the private prosecutor</u>." (emphasis added)[8]

"[U]nder New Jersey law 'it is well settled that in circumstances where a criminal charge is withdrawn or a prosecution is abandoned pursuant to an agreement or compromise with the accused, the termination is viewed as indecisive and insufficient to support a cause of action for malicious prosecution.'" <u>Ferry v. Barry</u>, No. 12-009, 2012 WL 4339454, at *6 (D.N.J. Sept. 19, 2012)(finding lack of favorable termination where plaintiff "pled guilty to an amended charge of loitering")(quoting <u>Gordon v. Berkeley Twp. Police</u>, No. 10-5061, 2011 WL 2580473, at *5 (D.N.J. June 27, 2011)(citing <u>Mondrow v. Selwyn</u>, 172 N.J. Super. 379, 384 (App. Div. 1980)(such a

---

[8] The commentary in the Restatement also states that "mercy," in the meaning of Clause (c), "implies a belief in the guilt of the accused or at the least in the possibility that he may be guilty. Hence a nolle prosequi entered under these circumstances is not a sufficient termination in favor of the accused." The Court notes some tension between this provision and the commentary stating that a termination in favor of the accused will be found where the prosecutor abandons the prosecution because he or she believes a conviction has become impossible or improbable, as it seems reasonably clear to the Court that many dismissals may arise in circumstances where the prosecutor may believe that the accused is or "may be guilty" but considers a conviction to be improbable or impossible (without implying any wrongdoing by the accused to make it so).

termination is insufficiently favorable because "the accused has consented to a termination which leaves open the question of his guilt and possible conviction, and so he cannot take advantage of it, after the prosecutor has foregone the opportunity of proving that there really was guilt"(citation omitted)); Thomas v. N.J. Inst. of Tech., 178 N.J. Super. 60, 61-62 (Law Div. 1981)(acceptance to a pretrial intervention program, termination for failure to adhere to program regulations, where no further action taken on criminal complaint, does not constitute favorable termination, as pretrial intervention program was entered into "pursuant to an agreement or compromise with the accused")).

In Williams, the District Court found a favorable termination where the complainant state trooper simply failed to appear for court twice and "the criminal charges against Mr. Williams were summarily dismissed." 2012 WL 1900602 at *12. The court stated that "Defendants have not put forth affirmative proof for why the dismissal of charges was not a determination favorable to Mr. Williams" and distinguished Morris. Id. The court stated that to find a lack of a favorable termination, in that case and on those facts would "provide an incentive to file false charges but to not prosecute in toto, discover, or appear in court. Thus, Defendants' motion for summary judgment as to

34

the malicious prosecution claim against [the state trooper] is denied as a matter of law." Id.

On these facts, the Court finds that there is no genuine dispute of material fact as to whether Plaintiff's criminal case terminated in her favor. The prosecutor dismissed the case against Plaintiff. This was not due to a downgrade of a more serious charge to obtain a plea to a lesser offense, in which case a downgrade may not amount to a favorable termination. That the prosecutor may have exercised unilateral prosecutorial discretion in favor of pursuing the more serious charge against Sancilardi does not make the dismissal of the defiant trespassing charge against Plaintiff any less favorable of a final resolution of Plaintiff's charge. The prosecutor's inclusion of the word "then" where the prosecutor stated, "And the co-defendant is going to be dismissed, then, as well" raises no more than metaphysical doubt about the abandonment of the criminal charge against Plaintiff. Where the record presents no evidence of a bargained-for compromise and dismissal, and no related charge having thereafter been brought against Plaintiff, no reasonable fact-finder could find this termination was not favorable to Plaintiff.

In short, there is no escape from the conclusion that the prosecutor's complete and formal dismissal of the charges

against Plaintiff constitutes a termination indicative of
innocence, especially where, as here, Plaintiff was never tried
or convicted and accordingly never lost the presumption of
innocence which she is afforded. The only way this dismissal
could reasonably have been any more favorable to Plaintiff is if
it had arrived with the proverbial apology. See, e.g., Manrique
v. City of Sunnyvale Dep't of Pub. Safety, No. C-94-20246, 1996
WL 241603, at *2 (N.D. Cal. May 1, 1996)(plaintiff arrested for
obstructing a police officer sued for "[a] dismissal . . . [and]
an apology"); Brian Rogers, Planned Parenthood videographer
turns down probation offer, San Antonio Express-News, Feb. 4,
2016, https://www.expressnews.com/news/local/article/Planned-
Parenthood-videographer-turns-down-6808178.php ("After Daleiden
turned himself in Thursday and was offered probation, his
lawyers said they would not accept anything but a dismissal and
an apology."). The Court notes that there is no evidence in the
record before the Court that Plaintiff consented or agreed to
any dismissal with the prosecutor. Accordingly, the Court finds
that Plaintiff has shown a favorable termination with regard to
the dismissal for lack of prosecution, and this issue will not
remain for jury determination at trial; the Court will
accordingly instruct the jury that the prosecution for defiant
trespass concluded favorably for Plaintiff.

The Court therefore turns to the other contested elements of Plaintiff's malicious prosecution claim against Catanio.

### b. Probable cause

Catanio claims that Plaintiff cannot show he lacked probable cause to arrest Plaintiff for defiant trespass. For the reasons stated in Section IV.A.1.a., supra, the Court finds that there is a genuine dispute of material fact as to this issue and continues to the final argument regarding the malicious prosecution claim.

### c. Malice

Catanio claims that Plaintiff has not put forth evidence to allow a reasonable finder of fact to conclude that he acted maliciously; rather, "he called an ambulance for Plaintiff" at her request and "pled" with Sancilardi to have Plaintiff cooperate, arguing that "[t]hese are not the actions of malice. These are the actions of an officer dealing with an intoxicated woman who refuses to conduct herself in an orderly manner." [Docket Item 44-4 at 10.]

The Court declines Officer Catanio's invitation to make this determination as a matter of law. While a reasonable finder of fact may certainly, on this evidentiary record, credit Officer Catanio's explanations for his actions, Plaintiff has put forth sufficient evidence that they may reasonably decline

37

to do so. Were a reasonable finder of fact to credit Plaintiff's evidence, one explanation of the sequence of events was that Catanio arrested Plaintiff without probable cause for videotaping him when he didn't want to be videotaped, and not for "the purpose of bringing [her] to justice." Johnson, 477 F.3d at 82. A reasonable finder of fact could also credit Plaintiff's evidence that Catanio arrested her first and then tried to figure out what he should charge her with after the fact (be that "obstruction," theft, or defiant trespass); to the extent that this suggests his arrest was pretextual and lacked probable cause, such a conclusion could assist a fact-finder in concluding that Catanio had the requisite malice. Furthermore, "in an appropriate case, malice may be inferred from a lack of probable cause." LoBiondo v. Schwartz, 199 N.J. 62, 94 (2009).

This constitutes a genuine dispute of material fact, and the Court will therefore DENY both motions for summary judgment as they relate to Plaintiff's claim of malicious prosecution against Catanio, except as to the element that the proceeding terminated favorably to Plaintiff, upon which element Plaintiff has prevailed herein. Likewise, Catanio's Motion for Summary Judgment is DENIED in its entirety because of the aforementioned disputes of material fact.

**B. Claims against Borgata**

38

### 1. Malicious prosecution

Borgata claims that Plaintiff's claims against it for common law malicious prosecution fail because Plaintiff cannot show that the prosecution terminated in her favor; because Plaintiff cannot show that Borgata had malice; because probable cause existed; and because Plaintiff cannot show that Borgata "initiated a criminal proceeding" against her. [Docket Item 43-2 at 12-25.]

The elements for Plaintiff's malicious prosecution claim against Borgata are, in the relevant respects, the same as those for her malicious prosecution claim against Catanio (as the constitutional claim looks to the common law claim for its substance, Donohue, 280 F.3d at 379-383). In order to state a malicious prosecution claim against Borgata, Plaintiff must show "'(1) that the criminal action was instituted by the defendant against the plaintiff, (2) that it was actuated by malice, (3) that there was an absence of probable cause for the proceeding, and (4) that it was terminated favorably to the plaintiff.'" Carney v. Pennsauken Twp. Police Dep't, 598 F. App'x 80, 82 n.5 (3d Cir. 2015)(quoting Lind v. Schmid, 67 N.J. 255, 262 (1975)).

The Court has already found that there are genuine disputes of material fact as to whether probable cause existed (Sections IV.A.1.a. & IV.A.1.b., supra) and whether the case against

39

Plaintiff resulted in a termination favorable to her (Section IV.A.2.a., supra). Accordingly, the Court turns to Borgata's other contentions, namely, that Borgata did not institute the criminal action against Plaintiff and that Plaintiff cannot show that Borgata had the requisite malice.

### a. Probable cause

The Court briefly addresses the element of probable cause to note that it is Borgata's perspective that is assessed when determining whether it lacked probable cause to initiate a criminal proceeding against Plaintiff, rather than Catanio's (as was analyzed supra). Lind, 67 N.J. at 369 ("Initially the defendant must have had probable cause to set the action in motion")(emphasis added).

The Court finds that there exists a genuine dispute of material fact as to whether Borgata had probable cause to accuse Plaintiff of stealing the alcohol. On the one hand, a reasonable finder of fact could conclude that Plaintiff in fact stole the alcohol, and that Borgata had reason to believe this was so when Borgata security personnel reviewed videotape (which is not in this record of cross-motions) and called ACPD to report the theft. On the other hand, Plaintiff has put forth sufficient evidence to allow a reasonable finder of fact to conclude that the security video did not actually depict Plaintiff stealing,

but rather depicted her only stopping at the bar in question
momentarily--for less time than it would take to steal the
bottles--and not actually stealing them, and furthermore, that
Plaintiff was not capable of concealing the allegedly stolen
items in her purse or on her person, a fact that also could
reasonably be believed to have been apparent to Borgata when it
called the police. See also Epperson v. Wal-Mart Stores, Inc.,
373 N.J. Super. 522, 532 (App. Div. 2004)(where "criminal matter
was dismissed for insufficient evidence, the jury could infer
that there was no probable cause for the criminal prosecution").

Accordingly, the Court finds that there is a genuine
dispute of material fact as to whether Borgata had probable
cause to institute criminal action against Plaintiff.

The Court next turns to the question of whether, under New
Jersey law, Borgata in fact did so.

### b. Institution of Criminal Action

Borgata argues that Plaintiff cannot show that it
instituted or initiated the criminal proceeding against her
because Catanio conducted his own investigation, because Catanio
ultimately arrested and charged Geissler for a different crime
than what Borgata employees initially reported, and because
Borgata ultimately refused to sign any criminal complaints
against Plaintiff. [Docket Item 43-2 at 14-18.]

41

In response, Plaintiff argues that she need not prove that Borgata signed a complaint against her, but satisfies this element by way of evidence showing that Borgata "wrongfully" reported to the ACPD that Plaintiff committed theft, "twist[ing] the truth" by advising Catanio "that the act of theft was caught on surveillance video" although the surveillance video "showed only that Plaintiff slightly paused by the bar." [Docket Item 48-5 at 8.] This is sufficient, she urges, to show that Borgata instituted the proceeding against her, especially where "Borgata never retracted its false accusation, thereby fortifying Officer Catanio's conviction that Plaintiff was a thief." Id.[9] Plaintiff contends that, although Catanio ultimately only charged Plaintiff with defiant trespass, he "actually wanted to charge Plaintiff with theft and repeatedly asked Borgata to sign a criminal complaint for theft" and that "Ms. Sancilardi overheard Officer Catanio brainstorming with his fellow officers and

_____

[9] The Court notes, parenthetically, that this assertion would lend credence to a fact-finder's potential determination that Catanio in fact had probable cause to arrest Geissler for theft, thereby insulating him from liability on Count One (and potentially Count Two), which requires a finding that he lacked probable cause to arrest Plaintiff for any offense. Plaintiff is entitled to press her claims in the alternative, of course, and there are genuine disputes of material fact here; this argument does not disturb the Court's opinion that summary judgment as to any of the claims discussed supra, based on a finding that probable cause either did or didn't exist as a matter of law, is inappropriate.

Borgata security on what charges to file against Plaintiff, which resulted in the Complaint against Plaintiff for defiant trespass." Id. at 9.

Different formulations of this element abound in the case law. The Law Division of the Superior Court of New Jersey has stated that "[t]he fundamental and underlying basis for liability for malicious prosecution is stated in many cases and in secondary authorities in the language of proximate causation. Typical is the rule laid down in 54 C.J.S. Malicious Prosecution § 14 at 966, as follows: 'The test of liability in an action for malicious prosecution is: Was defendant actively instrumental in putting the law in force? In order to sustain the action, it must affirmatively appear . . . that the [defendant] was the proximate and efficient cause of maliciously putting the law in motion, and, if such fact appears, defendant is liable, although he did not actually make or sign the affidavit on which the warrant was issued, or although he was not the prosecutor of record.'" Seidel v. Greenberg, 108 N.J. Super. 248, 257-62 (Sup. Ct. N.J. Dec. 24, 1969)(finding that actual arsonist is liable for malicious prosecution to innocent person unfairly prosecuted; noting that tort law concepts of "cause in fact" and "foreseeability" are relevant to analysis and stating that "rules of causation are more liberally applied" regarding

43

intentional acts). Signing or not signing a complaint "is not alone determinative[,]" Epperson, 373 N.J. Super. at 531. "[W]hile this factor is not met when defendant merely approves or silently acquiesces in the acts of another, it may be met by proof that defendant took some active part in instigating or encouraging the prosecution or advising or assisting another person to begin the proceeding, or by ratifying it when it is begun in defendant's behalf, or by taking any active part in directing or aiding the conduct of the case." Id. (internal citations and alterations omitted). See Wiltz v. Middlesex Cty. Office of Prosecutor, 249 F. App'x 944, 950 (3d Cir. 2007)(allegations that defendants "urged PARSA to prosecute appellant and prepared financial statements used in that prosecution were too conclusory" to survive motion to dismiss, and specific allegation that defendants "submitted an invoice to PARSA with a false annotation that it was for the 'reestablishment of the general ledger . . . required as a result of the former accountant/Treasurer'" "was both too minor and too removed from the prosecution to satisfy the 'instituted proceedings' prong of the malicious prosecution claim").

In general, where "the prosecution of plaintiff was brought about by the intervening and independent acts of law enforcement authorities who filed the complaint against him after making

44

their own investigation and appraisal," "their acts should insulate defendant." <u>Seidel</u>, 108 N.J. Super. at 264 (citations omitted). "The rationa[l]le of these cases is that if a citizen comes forth and tells a prosecuting officer truthfully what he knows and the prosecuting officer files a complaint, defendant is not liable for malicious prosecution. . . . [T]hese decisions are supported by a strong public policy in favor of having third persons come forward to aid in the prosecution of crimes without fears of reprisal by civil suits[.]" <u>Id.</u> at 265.

It appears to the Court that there is a genuine dispute of material fact as to the extent of any independent investigation by Catanio that would insulate Borgata from the consequences of allegedly knowingly and wrongfully accusing Plaintiff of theft. Construing the record in the light most favorable to Plaintiff against Borgata, Catanio merely acted as a rubber stamp and was bound and determined to arrest Plaintiff for theft once Borgata falsely called in the report of Plaintiff's alleged theft and Borgata never gave him reason to believe otherwise. <u>Cf.</u> <u>Carney v. Pennsauken Twp. Police Dep't</u>, No. 11-7366, 2013 WL 2444043, at *3 (D.N.J. June 3, 2013)(malicious prosecution claim fails because arresting officer "clearly conducted his own investigation"). The fact that Catanio ultimately charged her with defiant trespass because no personnel from Borgata would

45

sign a complaint regarding the theft is relevant to this question but not dispositive. See Epperson, 373 N.J. Super. at 531 (jury could have inferred that Wal-mart "encouraged, participated in, and perhaps even pressured the Franklin Township police to prosecute plaintiff" where Wal-Mart brought plaintiff to the police station, remained present while she was interrogated by police, and actually participated in the interrogation); cf. Baird v. Aluminum Seal Co., 250 F.2d 595, 600 (3d Cir. 1957)(contrasting Pennsylvania malicious use of process claim, concerning "initiation of proceedings and not a perversion of them," with Pennsylvania malicious abuse of process, where "original issuance of the process was justified but the process itself was put to an illegal use"). While Borgata's participation was certainly more limited than that of Wal-Mart, the Court finds that there is a genuine dispute of material fact as to its actions and whether they could constitute the initiation of a criminal proceeding.

The Court notes, as well, that the case law appears to focus on the inception of the criminal action, but does note that liability can attach also to the maintenance of the action rather than its initiation. See, e.g., Pitman v. Ottehberg, No. 10-2538, 2015 WL 6445872, at *7 (D.N.J. Oct. 23, 2015)(defendant alleged that probable cause existed when criminal proceedings

were initiated; court ruled that those arguments "focus too
narrowly on the time frame in which the criminal prosecution was
initiated. 'Malicious prosecution provides a remedy for harm
caused by the institution or continuation of a criminal action
that is baseless.' LoBiondo, 199 N.J. at 89. While [defendant]
may not have initiated the criminal proceedings against
[p]laintiff, he admits that he was involved in [p]laintiff's
case after [p]laintiff was indicted and that his
responsibilities included plea issues, hearings, trials, and
formulation of strategy[,]" finding that defendant "continued
the criminal prosecution of [p]laintiff, which is sufficient to
satisfy the first element of a malicious prosecution claim");
Rest. (Second) of Torts § 668, "Propriety of Purpose," cmt. e
("The only proper purpose for which criminal proceedings can be
instituted is that of bringing an offender to justice and
thereby aiding in the enforcement of the criminal law. If the
person initiating criminal proceedings does not himself believe
in the guilt of the accused, it is plain that he cannot have a
proper purpose. This is true even though the facts within his
knowledge or the information in his possession are such as might
lead a reasonable man to believe that the accused had committed
the offense charged against him."). This case law does not
elucidate the instant matter, as it appears that Borgata's

involvement in the criminal case was undisputedly substantially limited to the moment of inception, with very little contribution thereafter.

However, there appears to exist little case law discussing the effects of recantation, abandonment, or cessation of criminal allegations by the defendant accused of malicious prosecution, and the effect this may or may not have on the liability of that defendant. Cf. Pitman, 2015 WL 6445872 at *7 (effect of witness's recantation on malicious prosecution claim against district attorney); Coley v. Cty. of Essex, No. 2:08-4325, 2010 WL 3040039, at *5 (effect of witness's recantation on whether defendant was liable for continuing to prosecute plaintiff). Given no clear precedent for the proposition that immediate recantation of an allegation would serve to vitiate the element of initiation or continuation of a criminal action in a malicious prosecution claim, the Court, again, notes this possibility, but does not so conclude.

Again, construing the record in the light most favorable to Plaintiff's claims against Borgata, this case is distinguishable from Brenner v. Twp. of Moorestown, wherein the court found the plaintiff's "argument that a party can initiate a criminal proceeding by simply making a 9-1-1 call" "unpersuasive." No. 09-219, 2011 WL 1882394, at *16 (D.N.J. May 17, 2011). Here, the

48

allegations are not simply that Borgata made a 9-1-1 call but
that it falsely alleged the Plaintiff had stolen something and
falsely represented the evidence on which it based that
allegation (by saying that the theft appeared on video, which
Plaintiff claims it does not). A reasonable finder of fact could
conclude that this evinces either a subjective lack of belief in
Plaintiff's guilt or an objectively unreasonable belief in her
guilt, either of which could allow for a finding of liability.
See Rest. (Second) of Torts, § 668, cmt. e ("Since the absence
of belief in the guilt of the accused negatives the existence of
probable cause (see § 662), and since it is also conclusive of
the impropriety of purpose for which the proceedings were
initiated, it follows that proof of lack of belief, coupled with
proof of the favorable termination of the proceedings, is
sufficient to establish the liability of the person initiating
them").

However, on this evidentiary record, a reasonable finder of
fact could also conclude: that Catanio in fact conducted his own
investigation, whereupon he arrested Plaintiff for defiant
trespass pursuant to his own observations of her behavior; that
Borgata's initiation of the incident was either so minimal as to
be insubstantial; or that Borgata effectively recanted its
allegation before Catanio arrested Plaintiff, thereby

49

potentially insulating it from liability. Any of these
conclusions could be supported by the evidence in the record.
Accordingly, Plaintiff is likewise not entitled to summary
judgment on the basis of this argument.

### c. Malice

Borgata argues that Plaintiff cannot put forth evidence to
allow a reasonable jury to find malice. The Court disagrees, but
because the Court also finds that a reasonable jury could find
an absence of malice, Plaintiff is likewise not entitled to
summary judgment on the malicious prosecution claim against
Borgata.

Malice, in the context of malicious prosecution, "is
defined as the intentional doing of a wrongful act without just
cause or excuse. It requires proof that the act was wrongful in
the sense that it would, in the ordinary course[,] infringe upon
the rights of another and cause damage to that person[.]"
LoBiondo, 199 N.J. at 93-94 (internal citations and alterations
omitted). "Legal malice thus contemplated consists of the doing
of the wrongful act in utter disregard of what the actor knew to
be his duty, to the injury of another." Id. at 94 (internal
citation omitted). "[W]e have permitted malice to be inferred
from a finding that a defendant has neither probable cause nor a
reasonable belief in probable cause[.]" Id. (citing Jobes, 369

50

N.J. Super. at 398). "[T]he less evidence of probable cause
there is, the more likely it is that the [defendant] was
motivated by an impermissible, malicious intent." Id. However,
"if the only evidence of a lack of probable cause was the
inference derived from favorable termination of prior suit, some
extrinsic evidence of malice will be required." Id. (citing
Westhoff v. Kerr S.S. Co., Inc., 219 N.J. Super. 216, 323-24
(App. Div. 1987)).

        The Court finds, taking the evidentiary record in the light
most favorable to Plaintiff's claims against Borgata, that a
reasonable finder of fact could conclude that Borgata had
neither probable cause nor a reasonable belief in probable cause
that Plaintiff committed theft. If, as Plaintiff argues, the
surveillance video reflects that Plaintiff did not stop at the
bar for long enough to steal the alcohol and that the bottles of
alcohol in question could not have been concealed on her person,
a reasonable finder of fact could conclude that Borgata's
decision to report to ACPD that she stole the alcohol would not
be based on a reasonable belief that she had actually done so.
This would be sufficient for a finder of fact to find in
Plaintiff's favor on the required element of malice. See Jobes,
369 N.J. Super. at 398.

        Of course, a reasonable finder of fact could likewise

conclude, on the basis of this evidentiary record, that Borgata had (1) probable cause to believe Plaintiff stole the alcohol; (2) a reasonable belief in probable cause to believe Plaintiff stole the alcohol; or (3) an objectively correct belief, premised upon reasonable investigation, that Plaintiff in fact took the alcohol. Further, a lack of a malice could be shown from Borgata's refusal to sign a complaint against Plaintiff for theft and for permitting her to remain on the premises until checkout time in the morning; the fact-finder could reasonably determine, accepting these facts as true, that this conduct by Borgata personnel negated malice. Accordingly, Plaintiff is not entitled to summary judgment on this element or on her malicious prosecution claim against Borgata.

Accordingly, both Borgata's and Plaintiff's motions for summary judgment on the claim of malicious prosecution against Borgata are DENIED.

### 2. Negligence

Plaintiff claims that Borgata is liable to her on a negligence claim for breaching its duty "to properly investigate the facts surrounding the theft before accusing Plaintiff of theft" by "car[e]less[ly] investigat[ing]" the incident and "falsely report[ing] to the Atlantic City Police Department that Plaintiff committed theft, which led to Plaintiff's arrest and

52

imprisonment." [Docket Item 48-5 at 11-16.]

Borgata argues that Plaintiff has failed to establish a prima facie case of negligence, which the "Fifth Count very broadly asserts[.]" [Docket Item 43-2 at 28-32.] It argues that Plaintiff "has not and cannot establish Borgata breached [] any duty owed to her. . . . She has not established what duty owed to her was breached or how Borgata was in any way negligent in handling the situation." Id. at 29, 31.

Plaintiff claims that "Borgata owed a duty to investigate the theft properly" [Docket Item 48-5 at 11-13]; that it breached that duty when it "improperly investigate[d] the theft and concluded that Plaintiff stole wine and beer based on [] surveillance footage showing that 'as they [Plaintiff and Ms. Sancilardi] passed the bar it appeared customer Geissler stopped momentarily before entering the seating area.'" Id. at 13. She argues that she "had a room at Borgata, had tickets to a comedy show, and paid for all of their purchases throughout the night. Moreover, it would have been physically impossible to steal two (2) bottles of wine and one (1) bottle of beer without coming to [a] full stop at the bar." Id. Plaintiff claims that Borgata also breached this alleged duty when, after Officer Catanio arrived, "Borgata continued to maintain that Plaintiff had stolen wine and beer, without disclosing to Officer Catanio that

53

Borgata was relying on a surveillance video that could not implicate Plaintiff and that Plaintiff had denied stealing wine and beer." Id. Plaintiff claims that this improper investigation, unreasonable conclusion, and false report "proximately caused her" to be arrested, charged, and imprisoned, thereby causing her damages. Id.

In Barletta v. Golden Nugget Hotel Casino, the plaintiff pressed a claim of negligence "[a]pparently . . . maintaining that as a paying guest of the hotel, a higher duty was owed to [the plaintiff] than to defendant Bartch, who was not a guest of the hotel, but only an invitee of the Casino. Therefore, the Golden Nugget was not justified in arresting Mrs. Barletta at defendant Batch's, an invitee, insistence." 580 F. Supp. 614, 620 (D.N.J. 1984). The court stated: "A cause of action against an innkeeper who effects an unjustified arrest against a paying guest is one for false arrest. This false arrest standard is the same whether one is a paying guest of the hotel or an invitee of the casino. Further, the Court knows of no duty imposed on an innkeeper to keep his guest free from arrest." Id. The Barletta court therefore granted the defendant's motion for summary judgment on the negligence claim. Id.

Plaintiff does not cite any case law in support of her contention that Borgata owed her a duty under New Jersey law to

54

investigate the allegations against her properly. Cf. Ashton v. Brock, 868 N.W.2d 202, 2015 WL 3624387, at *1 (Ct. App. Iowa, June 10, 2015)("Iowa law does not recognize a tort for negligent law enforcement response and investigation in the absence of a special relationship between the plaintiff and law enforcement"); Rodriguez v. Perez, 99 Wash. App. 439, 443 (Ct. App. Wash. Div. 1 2000)("Thus, in general, a claim for negligent investigation does not exist under the common law because there is no duty owed to a particular class of persons. In the area of law enforcement investigation, the duty owed is typically owed to the public. For example, the duty of police officers to investigate crimes is a duty owed to the public at large and is therefore not a proper basis for an individual's negligence claim"); Harris v. Saint Joseph's University, No. 13-3937, 2014 WL 1910242, at *5-*6 (E.D.Pa. May 13, 2014)(plaintiff's claims that college breached its duty to hire and supervise staff members for investigating claims of sexual misconduct properly is better understood within the college student-college contractual relationship; declining to find the existence of a duty in tort); Achoa v. BB&T Bank, No. 17-2715, 2018 WL 1518607, at *2 (E.D.Pa. Mar. 27, 2018)(negligence claim against bank fails where plaintiffs were wrongfully "arrested for allegedly attempting to pass counterfeit United States currency" because

"plaintiffs have failed to allege facts to show any harm or injury stemming from an action of the defendant"; "[t]o allege that bank employees could create a dangerous or hazardous condition or cause multiple injuries to the plaintiffs by merely double checking the legitimacy of $12,600 in cash, and then contacting the police is more than far-fetched").

This Court previously considered a novel theory of negligence in Hakimoglu v. Trump Taj Mahal Assocs., 876 F. Supp. 625, 628 (D.N.J. 1994), where the Court "predicted that the law of New Jersey would not recognize a common law cause of action under dram-shop liability on behalf of a casino patron seeking to recover gambling losses occurring after a casino served the patron alcohol while visibly intoxicated and yet permitted him to continue gambling." In that case, the plaintiff pressed his theory of dram-shop liability on a duty established in a federal district court case, GNOC Corp. v. Aboud, 715 F. Supp. 644, 653, 655 (D.N.J. 1989), wherein the court "predicted that the New Jersey Supreme Court would imply . . . that 'a casino has a duty to refrain from knowingly permitting an invitee to gamble where that patron is obviously and visibly intoxicated[.]'" Hakimoglu, 876 F. Supp. at 630. However, between Aboud and Hakimoglu, the Appellate Division of the Superior Court of New Jersey ruled that implying a private duty or cause of action for money

56

damages from the Casino Control Act (as the Aboud Court did) was
incorrect. Miller v. Zoby, 250 N.J. Super. 568, 570 (App. Div.
1991). This Court, examining the common law foundations of dram-
shop liability, found that the "emphasis . . . is protecting
innocent victims from the effects of an alcohol server's
negligence[,]" and distinguished that focus from the New Jersey
Supreme Court's express recognition of the public policy "that
an intoxicated patron may not avoid responsibility for injuries
proximately caused by his or her voluntary decision to consume
alcohol to the point of intoxication." Hakimoglu, 876 F. Supp.
at 632 (internal citations omitted). As in the instant case, the
plaintiff in Hakimoglu brought a case "against a casino grounded
in tort law, alleging a tort not provided for by the
regulations, nor predictable as an expansion of New Jersey
common law." Id. at 633. After assessing the competing policy
interests at issue and noting (a) "that the New Jersey Supreme
Court has been and remains a national leader among the states in
developing and refining the common law," and (b) that New Jersey
casinos are subject to "a regulatory scheme that is pervasive
and strict[,]" the Court declined to recognize the existence of
the novel theory of negligence and dismissed the tort claim "for
failure to state a claim under New Jersey's common law of dram-
shop liability." Id. at 636, 637. The Third Circuit subsequently

57

affirmed, 70 F.3d 291, 293 (3d Cir. 1995), stating that "[a]lthough it is not clear which way the New Jersey Supreme Court would rule on this question . . . it seems to us more likely that the New Jersey Supreme Court would not recognize claims such as those that the plaintiff asserted. . . . '[E]xtending common law dram-shop liability into an area so fully regulated, without a glimmer of legislative intent, is not a predictable extension of common law tort principles and has not been foreshadowed by the New Jersey courts.'" Id., 70 F.3d at 293 (quoting Hakimoglu, 876 F. Supp. at 633 (footnote omitted)).

As in Hakimoglu, here, the Plaintiff propounds no citations to New Jersey cases nor to a legislative intent suggesting that New Jersey courts would recognize a negligent failure to investigate as a common law cause of action arising under New Jersey law. Accordingly, the Court declines Plaintiff's invitation to recognize this broadly stated and apparently novel theory of negligence under New Jersey common law. Borgata's motion as to negligence will therefore be GRANTED.

### 3. NIED & IIED

Borgata claims that Plaintiff's claims of IIED and NIED fail because she has not adduced evidence sufficient from which a reasonable finder of fact could conclude either that Borgata's

58

conduct was extreme and outrageous [Docket Items 43-2 at 33; 51 at 18-20], that its conduct proximately caused her emotional distress [Docket Item 43-2 at 34-35], that she suffered emotional distress, id. at 36-37, or that her emotional distress was severe [id.; Docket Item 51 at 21].

Borgata also claims that because Plaintiff cannot show a breach of any duty owed to her, her NIED claim fails. [Docket Item 43-2 at 34-35.] "The tort involving the negligent infliction of emotional distress can be understood as negligent conduct that is the proximate cause of emotional distress in a person to whom the actor owes a legal duty to exercise reasonable care." Decker v. Princeton Packet, Inc., 116 N.J. 418, 429 (1989). Because the Court has already found that Plaintiff has not put forth sufficient evidence to allow for a finding of a legal duty to investigate properly that Borgata allegedly breached, see Section IV.B.2., supra, the Court agrees that Plaintiff's NIED claim likewise cannot be pressed, and will GRANT Borgata's motion as to Plaintiff's NIED claim.

The Court next addresses Plaintiff's IIED claim. To establish a claim for IIED in New Jersey, "a plaintiff must show (1) that the defendant intended to cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the actions proximately caused emotional distress; and (4) that

59

plaintiff's emotional distress was severe." <u>Witherspoon v. Rent-A-Center, Inc.</u>, 173 F. Supp.2d 239, 242 (D.N.J. 2001)(citing <u>Buckley v. Trenton Saving Fund Soc.</u>, 111 N.J. 355, 366 (1988)). "[T]he plaintiff must prove that the defendant acted intentionally or recklessly. For an intentional act to result in liability, the defendant must intend both to do the act and to produce emotional distress. Liability will also attach when the defendant acts recklessly in deliberate disregard of a high degree of probability that emotional distress will follow." <u>Buckley</u>, 111 N.J. at 366. The conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Id.</u> (internal quotations omitted). The actions must have been the proximate cause of the plaintiff's emotional distress, and that emotional distress "must be so severe that no reasonable man could be expected to endure it." <u>Id.</u> (internal quotations omitted).

Taking the facts in the light most favorable to Plaintiff in her claims against Borgata, Borgata falsely accused Plaintiff of a crime to the police while having reason to know that Plaintiff could not reasonably be said to be guilty of that crime based on the evidence before Borgata when Borgata made the allegation. A reasonable factfinder could conclude that Borgata

then invited the police in, repeated the allegation, falsely asserted that it was backed by credible surveillance evidence when in fact it was not, and that Plaintiff was subsequently and foreseeably arrested, and that Plaintiff was only not charged with theft because the officer could no longer convince any Borgata employee to repeat the false allegation one more time.

However, it is also undisputed that Plaintiff created a disturbance when personnel in the steakhouse refused to serve her because of what they believed to be Plaintiff's visible intoxication (although Plaintiff disputes the reason she caused said disturbance), and that they had to summon Borgata security personnel to the scene, all of which occurred before any accusations were made that Plaintiff stole the alcohol. Further, it is undisputed by both Borgata and Plaintiff that Borgata personnel did not immediately evict and turn out Plaintiff, that they permitted her to stay overnight due to her upset and what they believed to be her intoxication, that they rescinded their call for assistance to the ACPD, and that they refused to sign a criminal complaint. No reasonable factfinder could conclude that this behavior by Borgata was extreme or outrageous under New Jersey law. Whether Plaintiff was actually intoxicated or only appeared to be intoxicated is not a material factual dispute; this aspect of the motion can assume, most favorably to

Plaintiff, that she was not intoxicated. This does not color the fact that Borgata's conduct was not extreme or outrageous.

Moreover, the Court also finds that Plaintiff has not adduced sufficient evidence to allow a finder of fact to decide that she in fact suffered severe emotional distress. See Buckley, 111 N.J. at 367-68 (collecting cases where emotional distress was held not to be sufficiently severe).

Plaintiff stated that the experience was "traumatic" for her husband, children, and family [Docket Item 43-5 at 166], that she found it "devastating to spend a night in jail," id., that being released without her belongings was "horrifying," id. at 167, that she experienced distress because her husband could not come to the jail at 3:00 am as he needed to stay with their children, id. at 170, that she spent more than $90 on phone calls from the jail to her husband in the hours that she was incarcerated, id. at 168, and that her children were distressed and "devastated" at hearing about her experience, id. at 172.

However, Plaintiff also stated that she did not seek any sort of medical treatment whatsoever as a result of this incident. Id. Plaintiff then modified that response to state that she continued to see her psychologist (of several years) to address "life in general problems," including marital problems caused (in part) by the occurrence of this incident. Id. at 172-

62

75. Plaintiff continued to see her psychologist on the same schedule that she saw him before the incident occurred; he never referred Plaintiff to any other healthcare providers, nor did Plaintiff seek any other medical treatment as a result of this incident, nor was she bodily injured as a result of the incident. Id. at 177-78, 185, 231-32.

The Court finds that this evidence is insufficient, as a matter of law, to establish the requisite level of emotional distress. Taking Plaintiff at her word, she was offended, even devastated, as a result of the incident. However, she did not suffer from or complain of any new medical, physical, or psychological conditions; did not begin a new or altered course of counseling or mental health treatment; and does not allege that she suffered any "physical illness or serious psychological sequelae" from the incident. Turner v. Wong, 363 N.J. Super. 186, 200 (App. Div. 2003). See Szemple v. Corr. Med. Svcs., 493 F. App'x 238, 243 (3d Cir. 2012)(where plaintiff asserted "that his diagnosed condition of [PTSD] was aggravated as a result of being denied appropriate care, but . . . did not provide any support for this assertion" or point to "any specific evidence of the nature of his increased pain, it is unclear whether he suffered severe emotional distress" and his IIED claim was "without merit"); Griffin v. Tops Appliance City, Inc., 337 N.J.

63

Super. 15, 26 (App. Div. 2001)(no IIED claim where plaintiff
claimed that he felt terrible, was devastated, and that his
whole personality changed as a result of the incident); J.L.D.
v. Est. of Gannon, No. 15-386, 2016 WL 8677315, at *23-*24
(D.N.J. July 29, 2016)(false accusation causing "anxiety, sleep
loss, lack of trust, damaged relationships, tinnitus, headaches,
and the like" insufficient to state "a claim for IIED or NIED");
Schillaci v. First Fidelity Bank, 311 N.J. Super. 396, 406-407
(App. Div. 1998)(where plaintiff claimed a false accusation of
theft and that she was "acutely upset" and effectively
"emotionally traumatized" "by reason of the incident, her
emotional distress was not sufficiently substantial to result in
physical illness or serious psychological sequelae")(internal
quotations omitted); Fleming v. United Parcel Svc., Inc., 255
N.J. Super. 108, 166 (Law Div. 1992)(cannot show outrageous
conduct where probable cause existed and where plaintiff: never
sought medical attention for claims of humiliation and emotional
distress where he alleged that he failed to seek medical help
because he believed help was unnecessary because it was
pointless; and reported generalized nervousness, headaches, and
depression after allegedly false claim of theft).

Accordingly, Borgata's motion for summary judgment as to
IIED is hereby GRANTED, and Plaintiff's motion as to IIED and

64

NIED is hereby DENIED.

**V.   CONCLUSION**

For the foregoing reasons, the Court will grant Borgata's motion as to defamation, negligence, IIED, and NIED. The Court will deny Borgata's motion as to malicious prosecution. The Court will deny Catanio's motion in its entirety. The Court will also deny Plaintiff's cross-motion, except that Plaintiff has prevailed upon one element of her claim for malicious prosecution, namely, that the criminal proceedings terminated in her favor. The accompanying Order will be entered.


**June 26, 2018**                          **s/ Jerome B. Simandle**
Date                                        JEROME B. SIMANDLE
                                            U.S. District Judge